215 F.3d 227 (2nd Cir. 2000)
 ARMANDO COLON, Plaintiff-Appellant,
v.
THOMAS HOWARD, individually and in his official capacity as Hearing Officer at Clinton Correctional Facility; GARY R. BEZIO, individually and in his official capacity, JEFF WHITE, Corrections Officer at Clinton Correctional Facility; MARK CARTER, Corrections Officer at Clinton Correctional Facility, Defendants-Appellees.
 Docket No. 97-2206
August Term 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: December 2, 1999
Decided: June 08, 2000
 
 Appeal from the March 25, 1997, judgment of the United States District Court for the Northern District of New York (Neal P. McCurn, Judge) rejecting, as a matter of law, prisoner's procedural due process claim for lack of "atypical" confinement under Sandin v. Conner, 515 U.S. 472 (1995), and dismissing prisoner's retaliation claim after adverse jury verdict.
 Dismissal of retaliation claim affirmed; dismissal of procedural due process claim vacated and remanded.
 Emma E. Harzem, New York, N.Y. (Arthur S. Linker, Rosenman & Colin, New York, N.Y., on the brief), for plaintiff-appellant.
 Martin A. Hotvet, Asst. Atty. General (Eliot Spitzer, N.Y. State Atty. General, Peter H. Schiff, Deputy Solicitor General, Nancy A. Spiegel, Asst. Atty. General, Albany, N.Y., on the brief), for defendants-appellees.
 Before: NEWMAN, WALKER, and SACK, Circuit Judges.
 Judge Walker and Judge Sack concur with separate opinions.
 JON O. NEWMAN, Circuit Judge.
 
 
 1
 This appeal is one in a series of cases in which district courts in this Circuit have rejected a prisoner's claim that he was confined in a segregated housing unit ("SHU") after a hearing that lacked procedural due process. The primary issue in such cases is whether the confinement imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Sandin v. Conner, 515 U.S. 472, 484 (1995).
 
 
 2
 Armando Colon, a New York prison inmate, appeals from the March 25, 1997, judgment of the United States District Court for the Northern District of New York (Neil J. McCurn, District Judge) dismissing his claims against state corrections officials. The District Court ruled as a matter of law that the disciplinary hearing that resulted in Colon's SHU confinement for 305 days did not require procedural due process protections. A jury found against Colon on his claim that prison officials had planted contraband in his cell in retaliation for his filing lawsuits. We conclude that Colon's 305 days of SHU confinement was "atypical" and a "severe hardship" within the meaning of Sandin. We reject Colon's claim that he is entitled to a new trial on his retaliation claim because of the admission into evidence of his prison disciplinary record. Accordingly, we affirm in part, vacate in part, and remand.
 
 Background
 
 3
 The disciplinary violation and hearing. Colon was incarcerated at the Clinton Correctional Facility ("Clinton"). On February 1, 1990, he went from his cell to keep a doctor's appointment. After examination at the doctor's office, Colon was sent to a mental health unit at Clinton. On the following day, while confined in the mental health unit, he was informed that Correctional Officer Carter had searched his cell and found two marijuana cigarettes and a "shank" (a homemade knife). An Inmate Misbehavior Report charged Colon with violating prison disciplinary rules concerning weapons and drugs.
 
 
 4
 A "Tier III" disciplinary hearing was held on February 5, 1990, before Hearing Officer Howard.[1] Colon testified that Carter had planted the contraband in retaliation for lawsuits Colon had previously filed against prison officials. To support his claim, he presented testimony from another inmate that Colon's cell looked like it had not been searched, and testimony from another inmate that Carter was carrying a shank prior to the search. Howard refused to allow Colon to question Carter about the reason for the search. Howard found Colon guilty of the charges and imposed punishment of 360 days in the SHU. The decision was affirmed upon administrative review.
 
 
 5
 In August 1990, Colon was transferred from Clinton to Attica, where his SHU confinement continued. He was returned to general population after serving 305 days in the SHU.
 
 
 6
 Initial District Court proceedings and first appeal. Colon filed the instant lawsuit under 42 U.S.C. § 1983, alleging that the contraband had been planted in his cell in retaliation for his prior lawsuits and that he had been denied a fair hearing. The suit was initially dismissed on the ground of collateral estoppel arising from an Article 78 proceeding in state court. Upon a prior appeal, we reversed in part, holding that a collateral estoppel bar did not arise from either the Article 78 proceeding or the Tier III disciplinary proceeding. See Colon v. Coughlin, 58 F.3d 865, 869-71 (2d Cir. 1995) ("Colon I").[2]
 
 
 7
 Proceedings in the District Court on remand. On remand, the District Court appointed pro bono counsel for Colon. The case proceeded to a jury trial before Judge McCurn on retaliation and Eighth Amendment claims against all defendants, and on procedural due process claims against Howard and Selsky. The Eighth Amendment claims were based on the conditions under which Colon was held for the eight days prior to and immediately after the hearing.
 
 
 8
 At the close of Colon's evidence, Judge McCurn granted McCormick's and Selsky's motions for judgment as a matter of law (JMOL) for lack of evidence showing their involvement.
 
 
 9
 At the close of all the evidence, Judge McCurn granted all defendants' motions for JMOL on the Eighth Amendment claims on two grounds: (1) that the conditions did not rise to an Eighth Amendment deprivation; and (2) that the claims were not raised until trial, thus denying the defendants discovery. Judge McCurn granted Howard's motion for JMOL on the retaliation claim for lack of personal involvement. He granted Howard's motion for JMOL on the procedural due process claim, ruling that the duration and conditions of the SHU confinement was not "atypical" under Sandin.
 
 
 10
 The remaining claims for retaliation against Bezio, Carter, White, and Costello went to the jury, which returned a verdict in their favor. Based on the District Judge's rulings and the jury's verdict, judgment was entered for all defendants.
 
 Discussion
 I. Procedural Due Process Claim
 
 11
 In Sandin, the Supreme Court ruled that the Constitution did not require that restrictive confinement within a prison be preceded by procedural due process protections unless the confinement subjected the prisoner to "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484. The Court ruled that the conditions of Sandin's confinement--placement in a special housing unit for 30 days--did not meet the newly announced standard of "atypicality." Since Sandin, considerable litigation has ensued on the issue of what duration and conditions of restricted confinement within a prison meet the Sandin standard. In cases dismissing Sandin claims before trial on defendants' motions for summary judgment, we have remanded for amplification of the record and more refined fact-finding. See, e.g., Welch v. Bartlett, 196 F.3d 389, 393-95 (2d Cir. 1999); Brooks v. DiFasi, 112 F.3d 46, 49 (2d Cir. 1997); Miller v. Selsky, 111 F.3d 7, 9 (2d Cir. 1997). This case, however, comes before us after the Sandin issue has been fully tried, with the prisoner represented by appointed counsel.
 
 
 12
 The evidence concerning the conditions and duration of Colon's SHU confinement was undisputed. The conditions were the normal conditions of SHU confinement in New York. See N.Y. Comp. Codes R. & Regs. tit. 7, §§ 304.1-.14 (1999). Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited. As to duration, Colon was required to serve 305 days of the 360-day sentence imposed.
 
 
 13
 "The content of the Sandin standard of 'atypical and significant hardship' is an issue of law, but if the facts concerning the conditions or the duration of confinement are reasonably in dispute, the jury (where one is claimed) must resolve those disputes and then apply the law of atypicality, as instructed by the Court." Sealey v. Giltner, 197 F.3d 578, 585 (2d Cir. 1999). With the facts as to conditions and duration undisputed, it was appropriate for Judge McCurn to decide the Sandin issue as a matter of law.[3] In ruling that Colon's SHU confinement was not atypical, he stated:
 
 
 14
 [T]here's no proof in front of me that that confinement, and there was testimony as to what went on in the confinement, was any different than the ordinary SHU confinement. And the deprivation which occurred in that confinement such as restricted move[ment] for one hour a day of exercise, lack of package facilities, lack of some commissary facilities, inability to carry out a job in the prison system, et cetera, loss of educational opportunities have been held time and time again in the second circuit [and] throughout the country not to amount to constitutional deprivation. The fact that he was confined for 300 days out of 360, in and of itself, is not atypical.
 
 
 15
 There are several cases, I won't bother citing them here now, upheld that although there's no bright line, confinement in SHU up to 360 days has been held in this district and is not a basis for due process liability [as] such. So, therefore, the claim against him for due process violation under Sandin has not been sustained.
 
 
 16
 We disagree with this ruling. This Court has not ruled that an SHU confinement of 305 days[4] (the duration of Colon's confinement) is not atypical under Sandin. The longest confinement in normal SHU conditions that we have ruled was not shown to meet the Sandin standard was 101 days. See Sealey, 197 F.3d at 589-90. Sandin itself involved restricted confinement of only 30 days.
 
 
 17
 Moreover, we have emphasized that the duration of SHU confinement is a distinct factor bearing on atypicality and must be carefully considered. See Sealey, 197 F.3d at 586 ("Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical.") (citation omitted); Welch, 196 F.3d at 392-93.
 
 
 18
 Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under Sandin. There are no precise calipers to measure the severity of SHU hardship, but we believe that wherever the durational line is ultimately drawn, 305 days satisfies the standard. As to atypicality, we are unaware of any data showing that New York frequently removes prisoners from general population for as long as the 305 days that Colon served. If New York could have shown that Colon's confinement did not compare unfavorably with "periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration," see Welch, 196 F.3d at 394, its opportunity to do so occurred at trial.
 
 
 19
 We conclude that Colon's confinement for 305 days in standard SHU conditions met the Sandin standard. Because the District Court ruled to the contrary and did not reach the further issues of whether procedural due process protections appropriate to the prison disciplinary hearing context were afforded or whether Howard is entitled to qualified immunity, we must return Colon's due process claim for further proceedings.
 
 
 20
 Since we can anticipate continuing litigation in this area as the Sandin standard is given further content, we think it appropriate to advise the district courts of this Circuit that in cases challenging SHU confinements of durations within the range bracketed by 101 days[5] and 305 days, development of a detailed record will assist appellate review. For instance, the parties might present evidence of the psychological effects of prolonged confinement in isolation and the precise frequency of SHU confinements of varying durations. Such a record will more likely result if counsel is appointed for the prisoner, both sides are given some latitude both in discovery and in presentation of pertinent evidence at trial, and, in cases where the absence of dispute as to relevant facts makes the Sandin issue appropriate for court determination, see Sealey, 197 F.3d at 585, the district judge makes the sort of particularized findings contemplated by our remands in Welch, 196 F.3d at 393-95, Brooks, 112 F.3d at 48-49, and Miller, 111 F.3d at 9-10.
 
 
 21
 Expressing only my own views and not those of the panel, I would have preferred to substantially eliminate the inevitable future litigation of Sandin cases in this Circuit by establishing a bright-line rule that confinement in normal SHU conditions of more than 180 days meets the Sandin standard. During oral argument of this appeal, I asked the parties for their views on the setting of 180 days as the line beyond which SHU confinement would be deemed atypical under Sandin (preserving the possibility that confinement for less than 180 days under conditions more severe than normal SHU confinement might also be shown to meet the Sandin standard). My inquiry included a likely defense of qualified immunity for officials accused of denying procedural due process protections prior to a decision establishing a 180-day rule.
 
 
 22
 After an opportunity for appropriate consultation, the office of the New York Solicitor General responded favorably to my inquiry, noting that "the Attorney General and DOCS [Department of Correctional Services] believe that by clarifying this unsettled area of the law, such a ruling would provide a welcome resolution to what has become a vexing problem." Letter from Martin A. Hotvet, Asst. Solicitor General, to Karen Greve Milton, Acting Clerk (Dec. 27, 1999). Counsel for the Appellant also endorsed a 180-day rule, which obviously would have benefitted his client, but disagreed that qualified immunity should be available as to procedural due process claims arising prior to the Sandin decision. See Letter from Arthur S. Linker, Esq. to Karen Greve Milton, Acting Clerk (Jan. 10, 2000).
 
 
 23
 Although I recognize that a decision establishing a numerical bright-line rule is a departure from the normal process of adjudication, especially in a case like the pending one, where the proposal was to draw the 180-day line substantially below the 305 days at issue in this case, I believed that such an approach was fully warranted in the context of Sandin claims. In the first place, courts have resorted to use of a specific standard in other contexts to aid in resolving controversies that present varied fact patterns. For example, after the Supreme Court ruled that the Fourth Amendment required arrested persons to be afforded "promptly" a determination of probable cause, see Gerstein v. Pugh, 420 U.S. 103, 125, 95 S.Ct. 854, 43L.Ed.2d 54(1975), the Court adopted 48 hours as a time period that "will, as a general matter, comply with the promptness requirement of Gerstein." County of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991). In another context, the Court set six as the minimum size of a jury that may constitutionally convict a person of a nonpetty offense. See Ballew v. Georgia, 435 U.S. 223, 243-45 (1978) (opinion of Blackmun, J.); see also Brown v. Louisiana, 447 U.S. 323, 331 (1980) ("Though the line separating the permissible jury practice from the impermissible may not be the brightest, a line must be drawn somewhere ... .") (citations omitted). Cf. Brown v. Thomson, 462 U.S. 835, 842-43 (1983) (population deviations from equality of state legislative districts of less then ten percent require no justification). On occasion, this Court has also adopted a bright-line standard. Considering the amount of a fine that could be imposed on an organization for criminal contempt without a jury trial, we set the amount at $100,000. See United States v. Twentieth Century Fox Film Corp., 882 F.2d 656, 663 (2d Cir. 1989). Earlier, facing the recurring issue of what discount rate should be used to calculate the present value of damage awards for future injuries, we adopted two percent as a standard to be used in the absence of evidence justifying a different rate. See Doca v. Marina Mercante Nicaraguense, S.A., 634 F.2d 30, 40 (2d Cir. 1980).
 
 
 24
 Secondly, Sandin claims are an especially appropriate context for a bright-line approach. This is a context in which a high degree of certainty is extremely desirable. Prison officials conduct thousands of prisoner hearings each year, and they are entitled to know beforehand whether these hearings are subject to the procedural due process requirements of the Constitution.[6] It is better to alert these officials to the federally enforceable requirements that must be observed than to leave the officials uncertain and merely afford damage remedies in those rare cases where courts determine after the fact both that the conditions were atypical and that the defendant officials were not entitled to qualified immunity. This context is similar to that faced by the Supreme Court in County of Riverside: "Although we hesitate to announce that the Constitution compels a specific time limit, it is important to provide some degree of certainty so that States and counties may establish procedures with confidence that they fall within constitutional bounds." 500 U.S. at 56. More important, the district judges of this Circuit would significantly benefit from use of a standard that would permit prompt dismissal of the many cases where the facts alleged in the complaint demonstrate that the duration and conditions of confinement do not exceed an announced standard.
 
 
 25
 Another consideration favoring a bright-line rule, especially in the context of Sandin cases arising in New York State, is that the consequences of a ruling in favor of atypicality are slight. New York has already provided by regulation for the same minimal procedural protections that the Constitution affords for internal prison confinements. See Walker v. Bates, 23 F.3d 652, 656 (2d Cir. 1994) ("The procedures established by the New York regulations comport with the due process procedural rights in disciplinary proceedings to which prison inmates are entitled."). For New York prisoners, the only consequence of a ruling in favor of atypicality is that the issue of whether required procedures were afforded becomes a matter of federal constitutional law, eligible to be litigated in a federal district court.
 
 
 26
 For all of these reasons, I would have preferred a decision that confinement under normal SHU conditions does not meet the Sandin standard unless it exceeds 180 days and that confinement of longer duration meets the standard.[7] However, a majority of the panel has decided not to proceed with a bright-line approach. Whatever line is ultimately to emerge will have to await subsequent litigation.
 
 
 27
 Judge Walker has explained in a concurring opinion why he considers announcement of a 180-day bright line rule inappropriate in this case. I share all of his general views on the important difference between the legislative and the adjudicative tasks. My disagreement is confined to the following points: (1) in some cases, a court acts entirely legitimately in the course of adjudication when it announces a broad ruling generally applicable beyond the facts of a litigated case, (2) in a few cases, a ruling of general application is better formulated (well within the adjudicative role) as a highly detailed ruling than as a broad principle of uncertain application, (3) in rare cases, such a detailed ruling is appropriately made as a bright-line ruling with numerical precision, and (4) this case would have been appropriate for such unusual treatment.
 
 II. The Retaliation Claim
 
 28
 Colon contends that the District Court erred in permitting the Appellees to introduce Colon's disciplinary record into evidence at the jury trial on his retaliation claim. He argues that this decision violated Federal Rule of Evidence 404(b) by permitting the jury to consider his propensity to violate prison rules.
 
 
 29
 The disciplinary record information was contained in Hearing Officer Howard's "Disposition Rendered Form," which he issued at the end of the disciplinary hearing to record the result. The form states that Howard was imposing a lengthy sentence because "Colon has previous drug charges in the facility and apparently [has] not learned from previous disposition."
 
 
 30
 When the disposition form was offered into evidence (under the government record hearsay exception), neither Colon nor Colon's counsel made an objection. Moreover, there were no objections when Appellees' counsel asked Howard to read the document, and when Howard read the portion that concerned Colon's record. The next day, at the charge conference, Colon made Rule 404(b) and Rule 403 objections to the admission of his disciplinary record. The Court found that an exception applied (but did not state the exception) and stated that it had considered Rule 403.
 
 
 31
 Even if objection to the disciplinary record was properly preserved, there is no basis for disturbing the verdict. As the Appellees argue, this information was part of the reason for the penalty that Hearing Officer Howard assessed, and was relevant at least to disprove Colon's allegation of partiality on Howard's part. Although the Court granted Howard's motion for JMOL on the retaliation claim prior to the case going to the jury for decision, that motion was not granted until after the disciplinary record was offered, and there was no request to strike the exhibit at that time.
 
 Conclusion
 
 32
 The judgment of the District Court is affirmed in part, vacated in part, and remanded for further proceedings.
 
 
 
 Notes:
 
 
 [1]
 Tier III hearings are held for "the most serious violations of institutional rules." Walker v. Bates, 23 F.3d 652, 654 (2d Cir. 1994); N.Y. Comp. Codes R. & Regs. tit. 7, § 270.3.
 
 
 [2]
 We affirmed the entry of summary judgment for two defendants, for lack of a showing of personal involvement. See Colon I, 58 F.3d at 873-74.
 
 
 [3]
 In arguing in favor of dismissal of the procedural due process claim, counsel for the Appellees did not dispute the facts concerning the conditions of SHU confinement, as Colon had testified, but contended only that SHU confinement for up to 365 days had previously been ruled in the Northern District not to violate the Sandin standard.
 
 
 [4]
 The Appellant, relying on Scott v. Albury, 138 F.3d 474 (2d Cir. 1998), invites us to focus on the duration of the SHU confinement imposed, which was 360 days, rather than the 305 days served. Scott considered the issue of whether the focus of the Sandin inquiry should be on the "maximum potential penalty," id. at 477, which in that case was unlimited, see id. Rejecting that approach, we focused on the penalty imposed, see id. at 477-79, which was 60 days, see id. at 476. We had no occasion to consider the appropriate focus where the confinement imposed is different from the confinement ultimately served. In Scott, the confinement served (58 days from February 2 until March 22, see id. at 476) was two days less than the confinement imposed. Scott did not consider whether the Sandin inquiry should focus on the duration of the confinement actually served. Subsequent cases have considered that duration relevant for the Sandin determination. See Sealey, 197 F.3d at 587 (focusing on the 101 days of confinement for which the defendant bore responsibility).
 
 
 [5]
 We do not exclude the possibility that SHU confinement of less than 101 days could not be shown on a record more fully developed than the one in Sealey to constitute an atypical and severe hardship under Sandin.
 
 
 [6]
 The argument based on certainty is somewhat diminished by the fact that the prison official conducting the hearing will not know until the conclusion of the hearing whether the duration of the confinement imposed exceeds the specified standard and therefore might not always be able to ascertain beforehand whether federal procedural requirements are applicable. Two responses can be made. First, the availability of a standard will alert the official to the need to provide federally required procedures in all hearings likely to result in confinements of a duration equal to or exceeding the standard. In this respect, the situation is similar to criminal contempt hearings where the procedural protection of a jury must be provided if the prosecutor intends to seek a penalty of more than six months. See Muniz v. Hoffman, 422 U.S. 454, 475-76 (1975); United States v. Twentieth Century Fox Film Corp., 882 F.2d at 662 n.3 ("[T]he prosecution frequently announces prior to trial . . . that it is seeking no more than a penalty within the limits of a petty offense."). Second, since New York already requires procedures similar to federal due process requirements, see Walker v. Bates, 23 F.3d 652, 656 (2d Cir. 1994), a prison official does not assume added burdens by assuring compliance with federal procedural requirements, even in cases where the duration of confinement turns out to be less than specified in a bright-line rule.
 
 
 [7]
 Since the proposal is not being adopted, I need not consider possible refinements such as whether a 180-day rule should not apply to an SHU-only facility like the Southport Correctional Facility, where SHU conditions are harsher than in SHU facilities of other New York prisons, see Lee v. Coughlin, 26 F. Supp. 2d 615, 632-33 (S.D.N.Y. 1998), or whether qualified immunity should be available for claims based on hearings that predate Sandin.
 
 
 JOHN M. WALKER, Jr., Concurring:
 
 33
 I concur in the opinion insofar as it expresses the views of the panel. I write separately to express my disagreement with Judge Newman's proposal in this case that we establish a bright-line rule of 180 days as the length of confinement in the SHU that amounts to an "atypical, significant deprivation" under Sandin v. Conner, 515 U.S. 472, 486 (1995).
 
 
 34
 Cases like this one have arisen with some frequency since the Supreme Court decided Sandin, and many of them have had to be remanded to the district court for lack of adequate findings concerning the conditions and duration of prisoners' SHU confinement. See, e.g., Welch v. Bartlett, 196 F.3d 389 (2d Cir. 1999); Brooks v. Difasi, 112 F.3d 46 (2d Cir. 1997). I therefore fully understand Judge Newman's desire to provide an across-the-board resolution of these fact-intensive disputes by fixing a specific duration of normal SHU confinement that triggers procedural due process. But, as a jurisprudential matter, I cannot agree to a solution that amounts to judicial legislation, particularly when the 180-day bright line that Judge Newman proposes is not the line implicated in the case presently before us.
 
 
 35
 The bright-line solution proposed by Judge Newman is not arrived at by adjudication but by legislative fiat. As judges, we are uniquely charged with interpreting the law and applying it on a case-by-case basis. This mandate, with its attendant limitations, derives from the Constitution's "case and controversy" requirement in Article III, and proscribes us from deciding "ill-defined controversies over constitutional issues, or a case which is of a hypothetical or abstract character." Flast v. Cohen, 392 U.S. 83, 100 (1967) (internal quotation marks and citations omitted). As Justice Harlan pointed out, the judiciary "is entitled to decide constitutional issues only when the facts of a particular case require their resolution for a just adjudication on the merits." Desist v. United States, 394 U.S. 244, 258 (1969) (Harlan, J. dissenting) (citing Marbury v. Madison, 1 Cranch 137 (1803)).
 
 
 36
 Judges are not legislators. Legislators are democratically accountable; federal judges are unelected and hold the office permanently. Legislators can gather facts to decide policy questions; judges are confined to the record of the case at hand. Legislation is usually the result of political and pragmatic compromises, and drawing sometimes arbitrary lines is part of what legislators do. Our task is different. Our task is not to dispense rough or approximate justice in future cases but to apply general legal principles to specific cases as they come before us. See Samuel Estreicher, Judicial Nullification: Guido Calabresi's Uncommon Common Law for a Statutory Age, 57 N.Y.U. L.Rev. 1126, 1138-39 (1982) (writing that "principled adjudication requires that [common law] rules be applied evenhandedly," whereas statutes, in contrast, "are enacted for reasons or employ means that are unavailable to the common law judge and are the product of, and derive their legitimacy from, a process bearing no resemblance to adjudication."). While, of course, we are mindful of a rule's likely future consequences, any rule we announce must be justified as necessary to its present application. When a judge reaches beyond the facts of the case at hand, there is an increased likelihood that the judge's imagination will fail adequately to contemplate the effects of the ruling on future litigation. That judges sometimes arrive at a bright-line rule does not justify our reaching for it independently of the process of adjudication.
 
 
 37
 This case illustrates the problem with establishing a bright-line rule unnecessary to the decision in the case. There has been no adversary briefing on whether 180 days is the appropriate bright-line to draw. The only data regarding the 180-day rule that we have before us is contained in the government's letter brief which states that "about 71% of all disciplinary confinements in SHU . . . were for 180 days or less." Hotvet Letter, supra. This spare piece of information, while relevant, is simply not enough to allow us to determine whether 180 days of SHU confinement is an atypical or ordinary incident of prison life. While about 71% of SHU confinement would appear to equate more or less to what is ordinary for SHU confinement, it does not speak to what is ordinary for prison life. Prison life obviously includes incarceration outside the SHU as well.
 
 
 38
 That both sides in this case are content with a 180-day rule is not a sufficient justification for Judge Newman's proposal. The plaintiff is happy because, in his case, his SHU incarceration of 305 days is beyond the bright-line. The defendants are happy because they receive automatic qualified immunity, and the State, representing the defendants, is happy because it gets a 180-day grace period in future cases and relief from burdensome litigation. But what of the future prisoner who receives a term of SHU incarceration of just under 180 days? His case will have been decided against him without the benefit of any argument on his behalf.
 
 
 39
 Judge Newman points to a history of line-drawing by this court and by the Supreme Court to justify his proposal. If anything, the examples he has chosen demonstrate the inappropriateness of establishing a 180-day bright-line rule in this case.
 
 
 40
 Judge Newman describes Ballew v. Georgia, 435 U.S. 223, 243- 45 (1978) as a case in which "the Court set six as the minimum size of a jury that may constitutionally convict a person of a non-petty offense." Supra at 233. However, in Ballew the Court was reviewing a Georgia procedure permitting trials by juries of five people. Thus, the Supreme Court did not fix upon an arbitrary number of jurors required to try non-petty offenses, but rather issued a constitutional ruling addressed specifically to the issue before it: whether a jury of five people was constitutionally infirm.
 
 
 41
 The Supreme Court also decided Ballew with the aid of extensive briefing concerning the practical results of reducing the size of juries. The Court cited no fewer than twenty-five articles from legal and social science literature analyzing the impact of juries' size on their decision-making capabilities. See, generally, Ballew, 435 U.S. at 232-40. The Court explained that it relied on these articles "because they provide the only basis, besides judicial hunch, for a decision about whether smaller and smaller juries will be able to fulfill the purpose and functions of the Sixth Amendment." Id. at 232 n.10. The 180-day rule proposed in this case is based on little more than a judicial hunch.
 
 
 42
 I also take little comfort from County of Riverside v. McLaughlin, 500 U.S. 44 (1991), requiring probable cause hearings to occur within 48 hours of arrest. While the Court in McLaughlin created a bright-line rule without the apparent benefit of independent expertise or prior legislative line-drawing, it did so in the context of a class action lawsuit on behalf of "all present and future prisoners in the Riverside County Jail including those pretrial detainees arrested without warrants and held in the Riverside County Jail from August 1, 1987 to the present, and all such future detainees who have been or may be denied prompt probable cause, bail or arraignment hearings." Id. at 49 (quotation marks omitted). The many substantive and procedural constraints attending a class action lawsuit ensure, to a much greater degree than is present here, that the line-drawing in that case occurred after considering the circumstances of relevantly affected parties. See, generally, Fed. R. Civ. P. 23 (requiring, inter alia, typicality, superiority, and notice for a suit to proceed as a class action).
 
 
 43
 Judge Newman also points to prior decisions of this court that he authored to illustrate that the Second Circuit has previously resorted to legislative-style line-drawing in factually similar situations. See United States v. Twentieth Century Fox Film Corp., 882 F.2d 656 (2d Cir. 1989); Doca v. Marina Mercante Nicaraguense, S.A., 634 F.2d 30 (2d Cir. 1980). To be sure, the rules announced therein endure. But the fact that legislation may endure, and may even be "good" legislation, does not justify this sort of judicial rule-making.
 
 
 44
 I would not be surprised if the ultimate rule in this circuit for the duration of SHU incarceration that triggers due process, arrived at through the process of litigation and adjudication, settles on something close to 180 days. At present, 101 days in the SHU does not trigger due process protection, see Sealey v. Giltner, 197 F.3d 578 (2d Cir. 1999), while, with this case, 305 days does. The gap will soon narrow and a rule will emerge; but it will do so through the appropriate process: adjudicative, not legislative, rule-making.
 
 SACK, Circuit Judge, concurring:
 
 45
 I concur in part II of Judge Newman's opinion. I also concur in part I of the opinion insofar as it disposes of the specific procedural due process claim on appeal and in the paragraph that urges district courts to develop detailed records in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305 days in order to facilitate appellate review.